| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:10-cr-00149-JAW |
| | ) | |
| RODNEY RUSSELL | ) | |

## ORDER ON MOTION FOR JUDGMENT OF AQUITTAL AND FOR NEW TRIAL

On April 28, 2011, a federal jury found Rodney Russell guilty of four counts of making a false statement in connection with a health care benefit program in violation of 18 U.S.C. § 1035(a)(2). *Jury Verdict* (Docket # 78). Mr. Russell moved for acquittal and for a new trial. The Court denies Mr. Russell's motion for acquittal because there was sufficient evidence from which a jury could find beyond a reasonable doubt that he made a materially false statement in connection with a health care benefit program. The Court denies Mr. Russell's motion for a new trial because there was no error in the proceedings and because a criminal defendant is not entitled to challenge jury verdicts on the ground that the verdicts are inconsistent.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On September 15, 2010, a federal grand jury returned an indictment charging Mr. Russell with six counts of making false statements in connection with a health care benefit program in violation of 18 U.S.C. § 1035(a)(2). *Indictment* (Docket # 3). On April 28, 2011, after a four day trial, a jury returned a verdict of

guilty on four and not guilty on two counts. *Jury Verdict*. On May 11, 2011, Mr. Russell moved for a judgment of acquittal and, in the alternative, for a new trial. *Def. Rodney Russell's Renewed Mot. for J. of Acquittal and Mot. for New Trial* (Docket # 80) (*Def.'s Mot.*). On May 12, 2011, the Court ordered the parties to brief an issue not mentioned in Mr. Russell's motions. *Briefing Order* (Docket # 81). In response, on May 19, 2011, Mr. Russell filed a supplemental brief. *Def. Rodney Russell's Supplemental Mem. in Supp. of Renewed Mot. for J. of Acquittal and Mot. for New Trial* (Docket # 82) (*Def.'s Supplemental Mem.*). On June 8, 2011, the Government responded. *Gov't's Obj. to Def.'s Renewed Mot. for J. of Acquittal and Mot. for New Trial* (Docket # 84) (*Gov't's Opp'n*). On June 21, 2011, Mr. Russell replied. *Def. Rodney Russell's Reply Mem. in Further Support of his Renewed Mot. for J. of Acquittal and Mot. for New Trial* (Docket # 87) (*Def.'s Reply*).

### B.    Evidence at Trial[1]

In 2007, 2008, and 2009, Mr. Russell applied to have his health insurance subsidized through Dirigo Health Agency's DirigoChoice program (collectively, Dirigo). *Gov't Exs.* 10, 13, 14, 17, 18, 22, 23, 24. Dirigo is a Maine government agency whose mission is to expand health insurance coverage to people who might otherwise be unable to afford coverage. *Trial Tr.* 6:2-8 (Docket # 83). Dirigo negotiates and contracts for group insurance policies with private insurance carriers. *Id.* 7:19-8:17. Maine citizens apply through Dirigo for enrollment in these

---

[1] In reciting the facts, the Court "view[s] the facts in the light most favorable to the Government, deferring to the jury's verdict if the evidence can support varying interpretations, at least one of which is consistent with the Defendant's guilt." *United States v. Ayewoh*, 627 F.3d 914, 919-920 (1st Cir. 2010).

group policies, and Dirigo determines eligibility. *Id.* 16:18-17:20. Dirigo subsidizes the insurance premiums of successful applicants at various levels according to financial need. *Id.* 8:23-9:2, 56:8-21. An applicant's income is the primary determinant of his or her subsidy level. *Id.* 8:23-9:2, 56:8-21. Dirigo makes its subsidy determinations based on an applicant's application as well as income documentation. *Id.* 17:1-19:3. Loans and gifts do not count as income for purposes of determining subsidy levels. *Id.* 54:20-23, 55:9-12. Dirigo largely relies upon the truthfulness of the information provided by the applicant, which includes income-verifying documents like tax filings, pay stubs, and letters from employers. *Id.* 17:1-19:3. Dirigo often follows up with applicants after they submit their applications, asking questions and seeking further information. *Id.* 17:7-13, 18:17-20.

In each year's Dirigo application, Mr. Russell made representations as to his income and employment status under penalty of perjury. In his 2007 application, he represented that he had no gross wages, tips, salaries, self-employment income, or gross receipts. *Gov't Ex.* 10. He further represented he received unemployment benefits in the first quarter of 2007 and had withdrawn $8,000 from an IRA in 2007. *Id.* He made the same representation in his 2008 application, stating he received no employment income but reiterating he had received an IRA distribution and unemployment compensation in 2007. *Gov't Ex.* 13. He attached his 2007 federal income tax return as proof of his 2007 income. *Id.* In 2008, he further certified he was unemployed. *Gov't Ex.* 14. In his 2009 application, Mr. Russell again

represented he was unemployed and received no gross wages, tips, salaries, self-employment income or gross receipts. *Gov't Ex.* 17; *Gov't Ex.* 18. After he submitted his 2009 application, Dirigo eligibility specialist Tarnya Brunelle called Mr. Russell to determine whether he had received unemployment benefits in the past year. *Trial Tr.* 41:3-43:1; *Gov't Ex.* 19; *Gov't Ex.* 25. Mr. Russell responded he had not received unemployment benefits or any other kind of income since spring of 2007. *Trial Tr.* 41:3-43:1; *Gov't Ex.* 19; *Gov't Ex.* 25.

Mr. Russell qualified for Subsidy Group B coverage in 2007, 2008, and 2009, entitling him to an 80% discount in his insurance premium each year. *Trial Tr.* 59:6-20, 69:17-21. To qualify for Group B, one's income could not exceed certain maximum levels. For the year 2007, the level was $14,700; for 2008, approximately $15,600; and for 2009, at least $15,600. *Id.* 69:17-70:13. If an applicant met the income requirement, the applicant would be eligible for Group B if he was unemployed or worked fewer than twenty hours a week. *Trial Tr.* 69:22-70:3. Dirigo did not have the discretion to reject an applicant from a subsidy group for which he was eligible. *Id.* 46:7-11.

The Government introduced evidence that Mr. Russell was employed and earning wages in 2007, 2008, and 2009. A number of witnesses testified they understood Mr. Russell to be working for Malcolm French in the years at issue. There was testimony that Mr. Russell worked for Mr. French's companies, Old Stream Conservation and Cold Stream Contracting. Other employees of Mr. French testified they saw Mr. Russell at the workplace. The employees did not know

whether the company they worked for was called Cold Stream Contracting or French Professional Forestry, but they knew it was Mr. French's business. They saw Mr. Russell at a desk at Mr. French's office and garage in West Enfield, Maine handling paperwork, answering the telephone, working on a computer, and using a rubber stamp bearing Mr. French's signature to sign checks.

A human resources representative for Boston Financial in Rockland, Maine testified that Mr. Russell applied for employment there in April or May 2010. The Government introduced into evidence the resume and employment application Mr. Russell submitted to Boston Financial. *Gov't Ex.* 35a, 35b. Both say that Mr. Russell worked as a treasurer for Old Stream Conservation in Enfield Maine from January 2007 to August 2009. *Id.* The employment application states that he worked under Malcolm French and received $10 an hour throughout his employment. *Gov't Ex.* 35b.

The employment application also listed Old Stream's phone number. *Id.* The Government introduced phone records which establish that Mr. Russell called the Old Stream number more than two dozen times between September 1, 2009 and the end of that year. *Gov't Ex.* 28. Banking records indicate that Mr. Russell was one of two people to open a business checking account for Old Stream in November 2006 and that he signed checks from that account in 2007, 2008, and 2009. *Gov't Ex.* 36.

Much of the evidence relating to Mr. Russell's work for Mr. French had to do with the construction of fish culverts. Jerry Davis, a manager at Griffin Greenhouse Supply (GGS) testified that between 2008 and 2009, he had many

conversations with Mr. Russell regarding Cold Stream's purchase of supplies for the culvert. Invoices of Cold Stream's purchases from Griffin Greenhouse were admitted into evidence and many confirm that the orders were placed "by Rodney." *See Gov't Ex.* 3a-3ll. The latest date of invoices indicating Rodney placed orders is September 23, 2009. *Gov't Ex.* 3ll.

The Government further introduced evidence of Mr. Russell's access to money during the relevant time period. Mr. Russell's bank records reflect frequent deposits into his bank account in 2008 and 2009. *Gov't Ex.* 26. It also introduced evidence that Mr. Russell made monthly rent payments of $575 throughout those years. *Gov't Exs.* 2, 2A. Moreover, Mr. Russell's wife, Rhonda Russell, testified that in August 2008, Mr. Russell gave her $4,471 in cash to write a check for his daughter's college tuition. *See Gov't Ex.* 27a. Mr. Russell elicited testimony that he received money during this period in the form of gifts and loans from family and friends.

### C.    The Parties' Positions

#### 1.    Mr. Russell's Motions

Mr. Russell renews his motion for acquittal pursuant to Rule 29(c). *Def.'s Mot.* at 3 (citing FED. R. CRIM. P. 29 (c)). He asserts that the Government failed to produce evidence sufficient to support the counts of conviction. *Id.* He says that the Government's theory of the case was that Malcolm French or one of his two companies paid Mr. Russell cash wages. *Id.* at 3-4. But he contends that the Government presented no evidence such wages were actually paid. *Id.* Instead, Mr.

Russell says the Government asked the jury to guess about the source of cash deposits in Mr. Russell's bank account. *Id.* at 4. He says the mere fact that Mr. Russell made deposits to his bank account is not even circumstantial evidence that Mr. French was the source of those funds. *Id.*

Referring specifically to Counts IV and V, regarding his October 23, 2009 representations to Dirigo that he had earned no income and that he was not employed, Mr. Russell maintains "[t]here is no evidence in the record from which a rational trier of fact could conclude that Mr. Russell was employed and earning cash wages as of October 23, 2009." *Id.* at 5. Even if the jury were to speculate that Mr. Russell was receiving cash wages, Mr. Russell argues that a rational jury could not find that he was employed or working at that time because there was uncontroverted testimony that he was injured in 2009. *Id.* Moreover, Mr. Russell cites evidence that his job application with Boston Financial stated that August 2009 was his end date with Old Stream Conservation, that no witnesses saw him at the Cold Stream Contracting office after it moved from Enfield to LaGrange in Spring of 2009, and that the last invoice from Griffin Greenhouse billed on Cold Stream's account was well before October 23, 2009. *Id.* Mr. Russell concludes that no rational trier of fact could find that he failed to disclose to Dirigo that he had wages, tips, or salaries. *Id.* at 6.

Mr. Russell moves for a new trial on three grounds. *Id.* at 6. First, he argues that the Court improperly instructed the jury. *Id.* at 6. He says the Court should have instructed the jury that to find that Mr. Russell acted willfully, the

Government had to prove that Mr. Russell's "actions were done 'with specific intent to do something the law forbids, or with specific intent to fail to do something the law requires to be done; that is to say with a bad purpose either to disobey or to disregard the law.'" *Id.* (quoting *Def. Rodney Russell's Proposed Jury Instructions* at at 3 (Docket # 60)). Second, Mr. Russell says the Court erroneously excluded as hearsay testimony from Rhonda Russell concerning Mr. Russell's state of mind when he was applying for the Boston Financial job. *Id.* at 7. He says Ms. Russell would have testified that Mr. Russell expressed difficulty deciding how to explain the gap in his employment from 2007 to 2009, thus explaining Mr. Russell's representation that he was employed by Old Stream. *Id.* Mr. Russell contends that the testimony fits the hearsay exception regarding a declarant's then existing state of mind. *Id.* (citing FED. R. CIV. P. 803(3)). Third, Mr. Russell claims the jury verdict is inconsistent. *Id.* He says "for the jury to acquit [him] of Count 1, but convict him of Counts 2-5, the jury must either have been confused as to the elements of the offense, or its verdict was the product of impermissible compromise." *Id.*

Following the Court's May 12, 2011 Order, Mr. Russell supplemented his motion with a discussion of whether the Government produced sufficient evidence for the jury to find that his statements to Dirigo were material. He cited the testimony of Dirigo's executive director, Karynlee Harrington. *Def.'s Supplemental Mem.* at 2. He says Ms. Harrington testified that Dirigo "does not have the discretion to refuse participation to an individual who is otherwise eligible and

within the program's income qualifications." *Id.* at 2. He notes that Ms. Harrington testified that an employed individual who does not work more than twenty hours a week for any single employer would be equally eligible for enrollment in the Dirigo program as an unemployed individual. *Def.'s Supplemental Mem.* at 5-6. Thus, he argues, Mr. Russell's statement that he was unemployed was not material to Dirigo's decision-making process. *Id.* at 6. Moreover, he asserts that his representations that he had no income were not material. *Id.* He cites Ms. Harrington's testimony that an otherwise qualified applicant would qualify for the same subsidy Mr. Russell received if his income did not exceed $14,700 in 2007, $15,600 in 2008, and $15,600 in 2009. *Id.* at 3, 6. He states that the Government failed to prove that Mr. Russell earned any wages in 2009. *Id.* at 6. Even accepting the Government's evidence of cash deposits in Mr. Russell's bank account and the money he paid in rent, he argues that the amount of money in evidence does not rise to the level of income to disqualify him from the subsidy he received. *Id.* at 6-7. In sum, Mr. Russell argues that any misrepresentation he made in 2009 could not be material because Dirigo would have provided him with the same subsidy level even if he actually earned all of the income the Government alleged. *Id.* at 7.

He concedes that the Government's case on Count II, regarding misrepresentations about his 2008 income, is stronger. *Id.* at 7-8. He acknowledges that his bank account records for 2008 demonstrate cash deposits totaling $9,600 and that he reported to Dirigo $13,293.33 in income from an IRA distribution and unemployment compensation that year. *Id.* Thus, if the Court concludes that his

cash deposits in 2008 were attributable to cash wages, he acknowledges his failure to report those wages would be material. *Id.* at 8.

## 2. The Government's Opposition

The Government first reiterates the evidence it submitted at trial to establish that Mr. Russell was employed and earning wages during the relevant times. *Gov't's Opp'n.* at 2-5. It argues that the jury could have reasonably drawn inferences from the evidence introduced at trial to conclude beyond a reasonable doubt that Mr. French employed Mr. Russell and paid him wages in 2008 and 2009. *Id.* at 6. The Government contends that the absence of witnesses testifying that they actually saw Mr. French pay Mr. Russell is consistent with a commonsense tendency to keep secret any unreported wages. *Id.* at 6-7.

Regarding Counts IV and V in particular, the Government argues the same evidence raised a reasonable inference that Mr. Russell received wages in 2009 and that he was working on or around October 23, 2009. *Id.* at 7-8. Specifically, it asserts that Mr. Russell's continued phone calls to and from Mr. French and the ongoing cash deposits into his bank account after October 23, 2009 raised the inference that Mr. Russell was then working for Mr. French. *Id.* The Government adds that evidence of Mr. Russell's continued rent payments before and after October 23, 2009 bolstered that inference. *Id.* at 8.

Turning to Mr. Russell's materiality argument, the Government thoroughly explicates the materiality standard and emphasizes that it is not at all stringent. It cites abundant case law for the proposition that a statement is material if it would

have a tendency to provoke government action, regardless of whether it actually provokes such action. *Id.* at 8-12. The Government asserts that the determination requires the resolution of two questions: "what statement was made?" and "what decision was the agency trying to make?" *Id.* at 10 (quoting *United States v. Gaudin*, 515 U.S. 506, 512 (1995)).

Applying that standard to Mr. Russell's case, the Government contends that the materiality determination is not dependent upon proof that Mr. Russell's actual income would have generated a different decision by Dirigo. *Id.* at 13-14. Rather, the Government argues that it only needed to prove that Mr. Russell's misrepresentations "had the potential to effect the functioning of [Dirigo] in evaluating his request for subsidized healthcare." *Id.* at 14. Turning to the second prong of the *Gaudin* test, the Government asserts that Dirigo was trying to decide whether Mr. Russell qualified for subsidized healthcare. *Id.* The Government cites Ms. Harrington's testimony that Dirigo considered Mr. Russell's employment status and income level in making that determination. *Id.* Accordingly, the Government maintains that Mr. Russell's misrepresentations about his employment status and income level were necessarily material. *Id.* It argues that it did not have to prove Mr. Russell's actual income, but only that his income differed from what he reported. *Id.* at 14-15.

Moreover, the Government argues that even if the materiality element for Counts II and IV hinged on the Government proving Mr. Russell's actual income, that burden would not apply to Counts III and V, which concerned Mr. Russell's

employment status. *Id.* at 15. The Government observes that Ms. Harrington testified that employment status was relevant to Dirigo's decision and asserts that the Government proved that Mr. Russell misrepresented his employment status.

The Government further argues that Mr. Russell's statements were material because they caused Dirigo "to take and refrain from taking certain actions, separate and apart from granting him a subsidy." *Id.* at 15-16. It cites Ms. Harrington's testimony that if an applicant lists any income, Dirigo examines supporting documentation to confirm an applicant's income level. *Id.* at 16. The Government says to report no income leaves Dirigo no choice but to accept the applicant's representation. *Id.* It argues that "the jury could have reasonably concluded that in 2008 and 2009, [Mr. Russell]'s false statements about income and employment caused [Dirigo] to refrain from requesting and reviewing income and employment documentation." *Id.* The Government contends that this makes his statements regarding employment status and income material:

> An inference could have been drawn from the evidence that if the defendant said he was employed, but earning $0.00 in income, a [Dirigo] employee would have asked for documentation explaining how one could be employed, but not earn an[y] income. The converse is also true. If he listed an income, but certified that he was unemployed, a reasonable inference could have been drawn that someone from [Dirigo] would have questioned him about how he could earn an income, but not be employed.

*Id.*

Next, the Government argues that it introduced sufficient evidence for a reasonable jury to conclude that Dirigo would have made a different subsidy decision if Mr. Russell had reported his actual income. *Id.* at 17. It cites Mr.

Russell's employment application with Boston Financial in which he stated that from January 2007 to August 2009, he received $10 per hour working for Old Stream Conservation. *Id.* Assuming a forty hour work week, the Government calculates an annual salary of $20,800. *Id.* The Government calculates the sum of money that passed through Mr. Russell's possession between his October 2007 and October 2008 Dirigo applications, including the deposits in his bank account, the amount he paid in rent, and the tuition money he gave to his daughter, amounted to $21,036. *Id.* at 18. Similarly, the Government contends there was evidence that at least $15,505 passed through Mr. Russell's hands in deposits and rental payments between November 2008 and October 2009. *Id.* It contends that the jury could have drawn a reasonable inference that both years' figures represented undisclosed income. *Id.*

The Government also argues that the Court should not grant Mr. Russell a new trial. *Id.* at 19-20. It first argues the Court's jury instruction regarding Mr. Russell's state of mind was properly modeled after statutory language prohibiting false statements. *Id.* at 19 (citing 18 U.S.C. § 1001). Second, the Government argues that the Court properly excluded Ms. Russell's testimony regarding Mr. Russell's state of mind because it was offered to prove the fact remembered or believed, thus removing it from the hearsay exception at Rule 803(3). *Id.* (citing FED. R. EVID. 803 advisory committee's note). Finally, the Government urges the Court not to probe the thought process of the jury to determine whether its acquittal on Count I is consistent with its conviction of Counts II through V. *Id.* at

20. Nevertheless, it argues that the discrepancy is supported by evidence that Mr. Russell did not begin working for Mr. French until 2008. *Id.* at 20 n.2.

### 3. Mr. Russell's Reply

Mr. Russell replies that the Government relies not on circumstantial evidence but on "tenuous and speculative inferences." *Def.'s Reply* at 1. He asserts that there is no inferential chain linking Mr. Russell's relationship with Mr. French to the cash deposits in his bank account. *Id.* at 1-2. He observes that the difficulty of proving the source of funds paid under the table does not absolve the Government of its burden of proving the elements charged. *Id.* at 2. He similarly argues that the Government failed to raise a reasonable inference that Mr. Russell was employed in October 2009 because any evidence of employment "greatly predates" October 2009. *Id.* at 3.

He says that the Government relies on an inapposite case in its discussion of the materiality of Mr. Russell's statements. He says that in *United States v. Alemany Rivera*, 781 F.2d 229, 235 (1st Cir. 1985), the United States Department of Housing and Urban Development relied on the defendant's misrepresentations in disbursing escrow funds to the wrong party. *Id.* In contrast, he says that Dirigo did not rely on his statements in this case. *Id.* at 4. He says that the Government's interpretation of the materiality standard is too narrow and would subject an applicant to fraud liability for under-reporting his income by "as little $1.00, even if that dollar would make no difference in [Dirigo]'s ultimate determination." *Id.* Employing the *Gaudin* analysis, Mr. Russell contends that the relevant question for

the second prong is not "does the defendant qualify for subsidized healthcare?" but "at which level does the defendant qualify for subsidized health care?" *Id.* He argues that Mr. Russell would have qualified for Subsidy Group B under any interpretation of the evidence. *Id.* at 5.

Mr. Russell also denies that the Government presented evidence that his statements might have caused Dirigo to refrain from taking action. *Id.* He says the Government did not identify what actions Dirigo might have refrained from taking. *Id.* Moreover, he states that Ms. Harrington testified that Dirigo conducted a follow-up on Mr. Russell in 2009 and confirmed that he had no income. *Id.*

Finally, Mr. Russell takes issue with the Government's calculations of his income in 2008 and 2009. *Id.* at 6. He asserts that there is no evidence that he worked a forty hour work week with Old Stream, noting that his Boston Financial application did not list the number of hours he worked. *Id.* He says the description of his job duties on his Boston Financial application suggests he worked less than full time at Old Stream. *Id.* He further argues that the Government is adding living expenses to the money passing through his hands in 2008 and 2009 without any evidence of what his living expenses were. *Id.* He cites Rodney Giguere's testimony that Mr. Russell may not have had any living expenses beyond what was paid from his bank account. *Id.* at 7.

## I.   DISCUSSION

### A.   Judgment of Acquittal

#### 1.   Legal Standard

The court "must enter a judgment of acquittal in a criminal case if 'the evidence is insufficient to sustain a conviction.'" *United States v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997) (quoting FED. R. CRIM. P. 29(a)). In reviewing the sufficiency of the evidence under Rule 29, the Court "view[s] the facts in the light most favorable to the Government, deferring to the jury's verdict if the evidence can support varying interpretations, at least one of which is consistent with the Defendant's guilt." *Ayewoh*, 627 F.3d at 919-920 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (internal quotation marks omitted). The Court "consider[s] all the evidence, direct and circumstantial, and resolve[s] all evidentiary conflicts in favor of the verdict." *Carroll*, 105 F.3d at 742.

### 2. Sufficiency of the Evidence of 2008 and 2009 Employment and Income

Mr. Russell first contends there was insufficient evidence to find beyond a reasonable doubt that he was employed and earning wages in 2008 and 2009. The Government acknowledges that its evidence was circumstantial but maintains that the circumstantial evidence raised reasonable inferences sufficient to support the four counts of conviction. The Court agrees with the Government. "Juries are routinely instructed that '[t]he law makes no distinctions between the weight or value to be given to either direct or circumstantial evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting 1A K. O'Malley, J. Grenig, & W. Lee, FEDERAL JURY PRACTICE AND INSTRUCTIONS, CRIMINAL § 12.04 (5th ed. 2000)). Here,

the Government introduced ample circumstantial evidence that Mr. Russell worked and earned wages in 2008 and 2009.

The Government introduced substantial evidence that Mr. Russell was employed by Mr. French or one or more of his companies from 2007 through 2009, including Mr. Russell's admission in his Boston Financial Employment application. The Government also introduced evidence that, throughout this period, Mr. Russell had regular access to a continued influx of cash from unknown sources. With this evidence, a jury could have reasonably inferred that the source of Mr. Russell's cash was compensation for the work that he had done. Indeed, in the Court's view, this conclusion would have been the most logical one. As the Government asserted in its response, work raises a permissible inference of compensation and influxes of cash raise a permissible inference of work. *See Gov't's Opp'n* at 16.

Moreover, the Government presented sufficient evidence to find that Mr. Russell continued to work for Mr. French after October 2009. Mr. Russell intimates that the jury was required to believe his Boston Financial representation that he stopped working for Old Stream in August 2009. Of course, this assertion is difficult to square with contemporaneous denial that he ever worked for Old Stream. Furthermore, the Government introduced evidence that Mr. Russell contacted Old Stream more than two dozen times between September 1, 2009 and December 30, 2009, and that he placed orders with GGS on behalf of Cold Stream after August 2009. Based on this evidence, the jury could reasonably infer that Mr. Russell continued to work for Mr. French after August 2009.

Mr. Russell's contention that he could not have worked because he was injured in 2009 is similarly unavailing. Many of the tasks Mr. Russell purportedly performed for Mr. French were sedentary; there was testimony that he worked at a desk, made and received phone calls, worked on the computer, handled bills, and shopped for supplies. Indeed, his Boston Financial employment application indicates that he worked as a treasurer for one of Mr. French's businesses. Mr. Russell's injury did not necessarily preclude any of this activity.

Finally, the jury could rationally find that Mr. Russell worked for Mr. French after Cold Stream's office moved from Enfield to LaGrange. Mr. Russell points out that the move took place in the spring of 2009, but he points out there was evidence of his continued employment with Old Stream on August 31, 2009, the date of the last check in the record from Old Stream's bank account. *See Def.'s Mot.* at 5. Given the evidence of Mr. Russell's continued association with Mr. French and his businesses after the spring of 2009, the jury was not obligated to equate the lack of evidence of his physical presence at the LaGrange office with the end of his employment.

### 3. Materiality of Mr. Russell's Representations

The parties do not substantially disagree regarding the standard for materiality. They agree that the *Gaudin* framework applies, requiring the jury to consider "what statement was made" and "what decision the agency was trying to make." *Def.'s Supplemental Mem.* at 5; *Gov't's Opp'n* at 10. Both parties cite cases holding that a statement is material if it has a natural tendency to influence or is

capable of influencing a government agency's decision-making. *See Def.'s Supplemental Mem.* at 5 (citing *United States v. Gerber*, 760 F.2d 68, 73 (3d Cir. 1985)); *Gov't's Opp'n* at 9 (citing *United States v. Edgar*, 82 F.3d 499, 510 (1st Cir. 1996)). Under this standard, the Government was not required to prove that a misstatement actually affected Dirigo's decision-making, only that it had the potential to do so. *United States v. Blasini-Lluberas*, 169 F.3d 57, 66 (1st Cir. 1999). *See also United States v. Corsino*, 812 F.2d 26, 31 (1st Cir. 1987) ("If a statement could have provoked agency action, it is material whether or not ever relied on") *abrogated on other grounds as recognized in United States v. Gonsalves*, 435 F.3d 64, 72 (1st Cir. 2006).

Under this standard, the Court has little trouble concluding that the Government presented sufficient evidence that Mr. Russell's statements to Dirigo were material. Ms. Harrington testified that an applicant's income is the primary determinant of an applicant's subsidy level. *Trial Tr.* 19:13-21. She testified that Dirigo makes its subsidy determinations based on an applicant's application as well as documentation showing proof of income. *Id.* 17:21-18:5. She testified that Dirigo largely relies upon the truthfulness of the information provided by the applicant and that it tries to get a broad picture of an applicant's income through documents like tax filings, pay stubs, and letters from employers. *Id* 18:6-16, 19:9012 20:1-14. Ms. Harrington testified that Dirigo often follows up with applicants after they submit their applications, asking questions and seeking further information. *Trial Tr.* 17:7-14.

From this testimony, the jury could have rationally found that Mr. Russell's statements that he had no income in 2008 and 2009 induced Dirigo to excuse him from providing income-verifying documentation. It is a logical inference that Dirigo would not have attempted to obtain income-verifying documentation from someone without income. Furthermore, based on Ms. Harrington's statements about Dirigo's follow-up investigations, it is a permissible inference that Mr. Russell's misrepresentations kept Dirigo from further inquiring into his economic situation. Further documentation or inquiry potentially could have yielded the information about Mr. Russell's actual compensation in 2008 and 2009. For example, if Mr. Russell listed Mr. French as his employer, Dirigo could have contacted him, determined whether Mr. French admitted employing him, and thus discovered exactly how much he paid Mr. Russell in 2008 and 2009. Mr. Russell acknowledges that a statement is material if it would tend to influence a decision-maker to give "an application closer scrutiny" or request "additional information on certain subjects." *Id.*; *Def.'s Supplemental Mem.* at 5 (citing *Gerber*, 760 F.2d at 73). Given the testimony that Dirigo often conducted follow-up inquiries to verify its applicants' incomes, Mr. Russell's disclosure that he was employed and receiving an income might have influenced Dirigo to verify what he reported. Under this standard, his failure to disclose must be deemed material.

Mr. Russell responds that the evidence does not support the conclusion that his representations precluded follow-up questions because a follow-up actually occurred. He refers to Ms. Harrington's testimony that Ms. Brunelle contacted Mr.

Russell to verify certain information after he submitted his 2009 Dirigo application. *Def.'s Supplemental Mem.* at 5. However, the subject of that communication was not related to Mr. Russell's misrepresentations. Ms. Brunelle contacted Mr. Russell merely to determine whether he had received unemployment income, because that information was missing. *Trial Tr.* 70:22-72:10. She did not ask whether Mr. Russell was employed or had received wages. The jury may have permissibly concluded that she did not inquire about his employment because that information was not missing; Mr. Russell had affirmatively represented that he had no employment income. Ultimately, Mr. Russell's representation that he had no income and no job had a natural tendency to influence Dirigo because it made it less likely that Dirigo would seek information verifying his actual income and employment status. *See United States v. Notarantonio*, 758 F.2d 777, 789 (1st Cir. 1985) (finding defendant's statements material when they prevented federal loan guarantor from discovering and taking actions to protect itself against defendant's default).

## B. New Trial

Mr. Russell moves for a new trial on three grounds. *Def.'s Supplemental Mem.* at 6-7. The first is that the Court did not instruct the jury that the Government was required to prove that Mr. Russell acted "with the specific intent to do something the law forbids, or with specific intent to fail to do something the law requires to be done; that is to say with a bad purpose either to disobey or disregard the law." *Id.* He bases this proposed instruction on *United States v.*

*Awad*, 551 F.3d 930, 939 (9th Cir. 2009), which construed the meaning of "willful" in the context of health care fraud under 18 U.S.C. § 1347. *Id.* The *Awad* Court held that Congress's inclusion of the word "willful" means that "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." 551 F.3d at 939 (quoting *Bryan v. United States*, 524 U.S. 184, 191-92 (1998)) (internal quotation marks omitted). Even assuming the Ninth Circuit was correct in its construction of "willful" in § 1347, that construction does not apply to the statute under which Mr. Russell was convicted.[2] *See Bryan v. United States*, 524 U.S. 184, 191 (1998) ("The word 'willfully' is sometimes said to be a 'word of many meanings' whose construction is often dependent on the context in which it appears").

The language of 18 U.S.C. § 1035, the statute under which Mr. Russell was convicted, closely parallels the language of 18 U.S.C. § 1001. The only discernible difference between § 1035(a) and §1001(a) is that the former refers to "any matter involving a health care benefit program" while the latter refers to "any matter within the executive, legislative, or judicial branch of the Government of the United States." Noting the similarity, at least two district courts have held that the two statutes should be interpreted consistently. *United States v. Mermelstein*, 487 F. Supp. 2d 242, 256 (E.D.N.Y. 2007) (noting "[t]he language of Section 1035(a)(1) mirrors that of 18 U.S.C. § 1001(a)(1)" and interpreting § 1035 according to § 1001 caselaw); *United States v. Dose*, No. CR04-4082 MWB, 2005 WL 1806414, at *12

---

[2] Shortly after the *Awad* Court construed § 1347 to require specific intent, Congress added subsection (b), which states that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b).

(N.D. Iowa, July 28, 2005) (holding that the subject matter of the prohibited misrepresentations is the only difference between § 1001 and § 1035). The Court joins these courts.

The First Circuit has explicitly addressed the proper interpretation of § 1001. In *United States v. Riccio*, 529 F.3d 40, 47 (1st Cir. 2008) (quoting *United States v. Gonsalves*, 435 F.3d 64, 72 (1st Cir. 2006)), the First Circuit "expressly rejected that section 1001 requires an 'intent to deceive.'" The "willfully" requirement merely requires that the Government prove "that the defendant knew that his statement was false when he made it or—which amounts to the same thing—consciously disregarded or averted his eyes from its likely falsity." *Id.* at 46-47; *see also United States v. McGauley*, 279 F.3d 62, 69 (1st Cir. 2002) (holding "[t]here is no requirement that the government prove that the statement was made for a fraudulent purpose" under § 1001). The Court's instructions were consistent with this standard.

Mr. Russell's second ground for a new trial is that the Court wrongly excluded testimony from Rhonda Russell. *Def.'s Supplemental Mem.* at 7. Specifically, the Court excluded Ms. Russell's testimony about Mr. Russell's statements to her concerning his state of mind when he completed his application for the Boston Financial position. During trial, out of the presence of the jury, the Court heard Ms. Russell's proffered testimony and determined it was inadmissible hearsay. Specifically, Ms. Russell was prepared to testify that Mr. Russell told her he was unsure how to complete the application with regard to his employment

status in 2007 through 2009 because he did not work during that time. The Court ruled that the statement did not fall into the exception for then existing mental, emotional, or physical condition because it related to Mr. Russell's memory or belief in an attempt to prove the fact remembered or believed. FED. R. EVID. 803(3). The statement related to Mr. Russell's recollection of his employment status in 2007 through 2009 and was offered to prove the truth of his statement that he did not work then. Although Mr. Russell says that he was offering Ms. Russell's statement to explain his reason for misrepresenting his employment history, the statement would inevitably weigh more directly on the ultimate question of whether he was employed from 2007 through 2009. The Court maintains that the proffered testimony was inadmissible hearsay and to the extent her testimony proffered admissible evidence, the Court would have excluded it under Rule 403 to avoid confusing the issues and misleading the jury. *See* FED. R. EVID. 403.

Finally, Mr. Russell argues that he is entitled to a new trial because the jury's verdict was inconsistent. *Def.'s Mot.* at 7. He says the jury could not acquit him on Count I and convict him on Counts II through V unless it was either "confused as to the elements of the offense, or its verdict was the product of impermissible compromise." *Id.* Criminal defendants are not entitled to challenge jury verdicts on the ground that the verdicts are inconsistent. *United States v. Powell*, 469 U.S. 57, 66 (1984); *United States v. Vargas-De Jesus*, 618 F.3d 59, 66 (1st Cir. 2010). "[A]n individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's

deliberations that courts generally will not undertake." *Powell*, 469 U.S. at 66. If a jury's verdict is irrational, a criminal defendant's recourse is to have the verdict reviewed for sufficiency of the evidence. *Id.* at 67. As the Court has determined that the evidence was sufficient to support convictions on Counts II through V, the Court rejects Mr. Russell's inconsistent verdicts claim.[3] *See supra* Part II.A.2-3.

## III. CONCLUSION

Because the Court finds there was sufficient evidence for a jury to find that Mr. Russell made materially false statements regarding his 2008 and 2009 employment and income in connection with his DirigoChoice application, the Court DENIES his Motion for Acquittal (Docket # 80). Because the Court properly instructed the jury, properly excluded Rhonda Russell's hearsay testimony, and concludes that the jury verdicts in Counts I and II through V are not grounds for a new trial, the Court DENIES Mr. Russell's Motion for a New Trial (Docket # 80).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2011

---

[3] As in *Vargas-De Jesus*, here, the "verdicts were not in fact necessarily inconsistent." *Vargas-De Jesus*, 618 F.3d at 66 n.3. As the Government explained, the jury could have concluded that it failed to prove that Mr. Russell was working in 2007 because it presented insufficient corroboration but that it successfully proved that he was working after 2007 because the Government corroborated its claim with documentary evidence. *Gov't's Mem.* at 20 n.2.